**DEAN TRUCK LINE, INC., Plaintiff,**

v.

**LOCAL 667 OF INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, De-fendant.**

No. EC 7115–K.

United States District Court,
N. D. Mississippi, E. D.

May 27, 1971.

James Price, Corinth, Miss., for plaintiff.

Howard R. Paul, Memphis, Tenn., for defendant.

## MEMORANDUM OPINION

KEADY, Chief Judge.

Plaintiff, Dean Truck Line, Inc. (Dean), is an interstate common carrier, hauling freight by motor vehicle in accordance with authority granted by Interstate Commerce Commission within the states of Mississippi, Tennessee and Kentucky, and has its domicile and principal office at Corinth, Mississippi. Defendant, Local 667 of International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Local 667), is a local labor union based at Memphis, Tennessee, and affiliated with the national union, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (International); Local 667 represents as collective bargaining agent the local pick-up and delivery drivers employed by Dean at its terminals in Tupelo and Memphis.

Invoking federal jurisdiction under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a),[1] and the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., Dean on February 1, 1971, sued Local 667 in the district court, asserting that it had made a written collective bargaining agreement with Local 667 which covered the period April 1, 1970 to June 30, 1973, and provided for wage increases of $1.10 per hour over the 39-month contract period, and that Local 667 was not respecting this agreement since it was contending that Dean's employees were entitled to greater hourly wage increases, totaling $1.85 for the same period of time. The complaint charged that Local 667 had filed grievances in support of its position with the Southern Multi-State Grievance Committee, an arbitration group composed of representatives from trucking employers and labor unions. Dean sought a declaratory judgment that the written documents filed with its complaint constituted a valid and binding labor agreement between it and Local 667, and that no dispute subject to grievance and arbitration existed between the parties.

On February 15 Dean applied for a temporary restraining order to prevent Local 667 from prosecuting its grievances filed as Cases No. 266 and 267 before the Southern Conference Grievance Committee until the further order of the federal court. This application was resisted by Local 667 and, after a brief evidentiary hearing, the court declined to restrain the arbitration proceeding, but did so without prejudice to Dean's right to later seek a preliminary injunction upon completion of the arbitration.

On February 18 the Multi-State Grievance Committee met at Biloxi, Mississippi, heard factual statements concerning the wage dispute from C. H. Augustine, president of Local 667, and John F. Dean, Jr., plaintiff's president, and upheld the grievances.

Local 667 then answered the complaint filed in federal court in which it denied Dean's version of the contract and asserted that the real agreement obligated Dean not only to pay the $1.85 wage increase but also to submit the dispute to arbitration. Local 667 then counterclaimed for enforcement of the arbitration award, or alternatively, for money

---

1. "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."

judgment for the wages provided by the $1.85 package.

On April 1 the court conducted full evidentiary hearing and consolidated final trial on the merits with Dean's application for a preliminary injunction to set aside the arbitration award and grant the declaratory relief sought by the complaint.

## I.

The evidence established that on several previous occasions Dean's officers and representatives of Local 667 had negotiated collective bargaining agreements, and the last agreement, prior to the one in dispute, expired March 31, 1970, which was also the expiration date of the National Master Freight Agreement (NMFA) and the Southern Conference Area Supplement (Southern Supplement). NMFA is an agreement ordinarily negotiated on a national scale between International and certain large employer groups, primarily Trucking Employers, Inc., (TEI) ; and this agreement contains numerous provisions regarding rules and conditions of work, wage rates and other economic benefits which are applicable to the entire nation. The master contract is augmented by the same parties to the negotiation entering into area supplements applicable to the different geographical areas of the United States. The Southern Supplement, also known as the City Supplement, pertains to covered employees of carriers operating in nine southern states, including Tennessee and Mississippi. As a small carrier, Dean was never a member of TEI or of any other employer association that participated with International in the national negotiations.

After a six-week period of negotiation, International and the employer groups reached agreement for a new NMFA and Southern Supplement for the period from April 1, 1970 to June 30, 1973. These agreements, which were widely publicized throughout the trucking industry, provided for total wage increases in four steps totaling $1.10 per hour over the contract period. By separate memorandum (Ex. 14) International and TEI agreed that if certain independent unions in the Chicago area made better wage contracts with trucking employers represented in the national negotiations, International and TEI would, upon notice, reopen their negotiations, with either party left free to resort to lawful economic sanctions if a subsequent agreement could not be reached. The officials of Local 667 and its union membership, which had to vote acceptance of the national agreements, were fully aware of the effect of this memorandum. Subject to this contingency, the new NMFA and Southern Supplement became effective May 18, with the increases in wages and other economic benefits made retroactive to April 1, 1970.

Aware that a $1.10 wage package was in process of being nationally negotiated, Dean on April 30 joined an employers' group known as Southeast Small Carriers Labor Relations Association (Small Carriers), which it learned was endeavoring to negotiate an 80¢ wage package on behalf of certain small truck lines in the Memphis area. Dean authorized this association to submit to Local 667 an 80¢ wage package applicable to Dean's local employees. This proposal, which Small Carriers submitted to Local 667 on May 22, was rejected by the Memphis employees by a 15 to 1 vote. Because of the overwhelming negative vote, the offer was not submitted to the Tupelo employees.

After telephone conversations on June 2 with H. H. Pennington, Local 667 Assistant Business Agent, and on June 3 with Billy Moffitt, another Assistant Business Agent, regarding a new labor agreement, John F. Dean, Jr., plaintiff's president, received at Corinth from Local 667 a document already signed by C. H. Augustine, the union's president, reading as follows:

"This is to certify that the below named trucking company and Teamsters Local 667 agree to be bound by all terms and conditions of the Na-

tional Master Freight Agreement for the period of April 1, 1970 to June 30, 1973 and the Southern Conference Supplement for the City.

Dean Truck Line, Inc. agrees to make all monetary items retroactive to April 1, 1970 and will make such payments within two weeks from this date." (Ex. 8)

Dean on June 4 executed the foregoing agreement and, as requested, sent two executed copies by mail to Local 667. In its transmittal letter Dean sought a clarifying interpretation of a single NMFA provision, and this interpretation was concurred in by Local 667's reply letter dated June 17.

Shortly after the execution of the above agreement, Dean implemented its provisions by making all increases in the first step of the $1.10 wage package and in health and welfare benefits retroactive to April 1, 1970. On June 12 Dean withdrew from Small Carriers and revoked authority to represent it in further negotiations.

Several weeks later an independent local union in the Chicago area directly negotiated with a trucking employer which had participated in the national negotiations a contract containing wage increases of $1.65. Because of this and in accordance with their Memorandum of Understanding, TEI and International in July reopened and renegotiated NMFA and Southern Supplement (Ex. 2) which changed the wage package from $1.10 to $1.85 and increased other economic benefits for employees.

Dean first learned in August that its employees were claiming that they were entitled to the $1.85 package. Dean's officials in the ensuing months met with Local 667 representatives in an effort to resolve their differences. Dean's position in these discussions was that it had a firm $1.10 wage contract as executed on June 4 and that it wanted its employees to accept the agreement without animosity, while Local 667's position was that Dean had agreed to the NMFA and Southern Supplement for the period April 1, 1970 to June 30, 1973, which agreements not only provided for reopening of negotiations but also incorporated the $1.85 wage package subsequently worked out between International and TEI.

The controversy centers upon the "terms and conditions" of NMFA and Southern Supplement, to which Dean and Local 667 had signified their agreement. At the time Moffitt sent Dean the agreement, it was with his written instruction (Ex. 7) that Dean should sign "If you are agreeable with the National Master and the City Supplemental", (sic) and "The National Master and the City Supplement [are] enclosed." The enclosures referred to were a Xerox copy outlining only the changes in 37 Articles of the former NMFA and the addition of two new Articles, but without any schedule of wage rates (Ex. 9), and a mimeographed copy of the Southern Supplement containing 20 additional Articles but incomplete as to the wage provisions (Article 53, § 2, at page 42.) The last page of this document provided: "This is a proposed agreement and is subject to additions, deletions, changes and corrections." (Ex. 10).

There is a sharp dispute in the substance of a critical telephone conversation between Moffitt and Mr. Dean which took place on June 3, the same day on which Moffitt forwarded Ex. 7, 8, 9 and 10 to Dean. According to Moffitt, when Mr. Dean asked for a copy of the new NMFA and Southern Supplement for study in reaching a decision, Moffitt told him he would send what documents Local 667 had but that they would not cover the $1.10 wage increase which was merely tentative, "since Chicago and St. Louis are still out", and the increase might be more. Moffitt testified that Dean then replied that he would pay the $1.10 increase so long as it was possible and then shut his company down. According to Mr. Dean, Moffitt failed to tell him that the $1.10 wage package was not a firm figure or that it was subject to renegotiation for any reason, and he understood Local 667

was submitting a firm agreement containing the $1.10 wage package.

At the time of the above telephone conversation, Dean's president had available a four-page document entitled "Summary of Tentative Monetary Agreement" (Ex. 1) which he thought had originated from Local 667. While this document accurately outlined the monetary agreement as contained in the $1.10 wage package tentatively agreed upon between International and TEI, it omitted reference to the provision for reopening wage negotiations upon the contingency set forth in the Memorandum of Understanding. Apparently the fact that the instrument was styled a *tentative* monetary summary did not impress Mr. Dean as significant and he positively disclaimed knowledge of the Memorandum of Understanding. On the other hand, Local 667 denied that the four-page document on which Mr. Dean testified he and his associates relied was released by it or formed any part of the contract negotiations. The officials of Local 667, while acknowledging that they did not specifically tell Mr. Dean about the Memorandum of Understanding in their telephone conversations, testified that Dean's bargaining agent, Small Carriers, had full knowledge of the tentative nature of the $1.10 wage package and of the terms of the Memorandum of Understanding and was familiar with every facet of the national negotiations.

Despite the fact that the printed materials received by Dean were patently incomplete on their face, Dean's president made no further inquiry of Local 667 but, as stated above, signed the document agreeing to be bound by the new NMFA and Southern Supplement.

Nevertheless, the documents which were submitted to Dean by Local 667 (Ex. 9 and 10) provide for arbitration in identical language with that contained in the official NMFA and South-ern Supplement (Ex. 2). NMFA Article 8 (in both Xerox and printed format) provides in part:

"ARTICLE 8    NATIONAL GRIEVANCE PROCEDURE

(a) All grievances or questions of interpretations arising under this Master Agreement or Supplemental Agreements thereto shall be processed as set forth below. * * *

(1) All factual grievances or questions of interpretation arising under the provisions of the Supplemental Agreement, (or factual grievances arising under the National Master Agreement) shall be processed in accordance with the grievance procedure of the applicable Supplemental Agreement. * * *."

The Southern Supplement Article 42 in mimeographed form and Article 44 in the printed booklet [2] provide:

"§ 1. The Employers and the Unions, parties to this Agreement shall together create and maintain permanent State or Multiple State Committees covering the states covered by this Agreement. The State or Multiple State Grievance Committees shall remain as now established unless changed by mutual agreement between the parties to this Agreement. It shall be the function of these Committees to adjust the disputes which cannot be settled between the Employer and the Local Union. The State or Multiple State Grievance Committees shall consist of an equal number of members appointed by Employers and Unions, but not less than three (e) from each group. * * *"

"§ 3. It shall be the function of the various committees, above referred to, to settle disputes which cannot be settled between the Employer and the Local Union in accordance with the procedures established in Section 1, Article 43."

---

2. This change in number sequence was necessitated by the addition of two new articles in the basic NMFA, "Nondis-crimination" and "Training Program", as reflected in both instruments.

The Southern Supplement Article 43 in mimeographed form and Article 45 in the printed booklet provide:

"§ 1. The Unions and the Employers agree that there shall be no strikes, lockouts, tieups, *or legal proceedings* without first using all possible means of settlement as provided for in this Agreement of any controversy which might arise. Disputes shall first be taken up between the Employer and the Local Union involved. Failing adjustment by these parties, the following procedures shall then apply:

(a) Where a State or Multiple State Committee, by a majority vote, settles a dispute no appeal may be taken to the Southern Conference Area Grievance Committee. Such decision will be final and binding on both parties." (Emphasis added)

## II.

The parties agree that this court has power to decide whether a collective bargaining agreement exists between them. Such a decision clearly is necessary to determine our jurisdiction under § 301.[3] The parties differ, however, as to the extent of our power to determine the contract terms and the effect of our decision on the arbitration award. Plaintiff contends that the court's power is not limited to determining whether a valid labor agreement exists, but necessarily includes an ascertainment of the contract's essential terms, such as wage provisions, which may be in dispute between the contracting parties. Defendant disagrees, contending that once the court has found that a collective bargaining agreement exists and that it contains a provision requiring arbitration of disputes arising thereunder, the court should go no further, but abstain from deciding or even considering the merits of the dispute.

■ We hold that the parties agreed to abide by *all* terms of the NMFA and

Southern Supplement and that their agreement was valid and binding. Regarding the wage provision, we agree that the letter-contract, the copy of the Southern Supplement sent by Moffitt to Dean and the portion of the NMFA entitled "Summary of Tentative General Monetary Agreement," upon which Dean avers it relied, are all highly ambiguous and subject to interpretation as to the wage package agreed upon. Nevertheless, we may not conclude that this ambiguity prevented a meeting of the minds between the parties since their agreement to be bound by NMFA and the Southern Supplement was clear and unambiguous.

■ Having concluded that a valid and binding collective bargaining agreement was entered into, we next consider whether we should go a step further and interpret the ambiguous terms concerning wages or whether the decision of the Multi-State Grievance Committee should be left undisturbed. In deciding this issue we are mindful of the federal policy favoring arbitration in the area of labor law where the parties have so agreed.[4] In such cases the function of the court is confined to ascertaining whether the claim arbitrated was one made subject to arbitration by the contract. In the case at bar the arbitration provision included not only "factual grievances" arising under the contract but also "questions of interpretation" arising thereunder. This language convinces us that all disputes about ambiguities in the terms of the basic collective bargaining agreement were subject to arbitration. As the Supreme Court stated in United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U. S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960):

"Yet, to be consistent with congressional policy in favor of settlement of disputes by the parties through the machinery of arbitration, the judicial

3. United Steelworkers of America v. Rome Industries, Inc., 437 F.2d 881 (5 Cir. 1970); Baker v. Fleet Maintenance, Inc., 409 F.2d 551 (7 Cir. 1969).

4. United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960).

inquiry under § 301 must be strictly confined to the question of whether the reluctant party did agree to arbitrate the grievance or did agree to give the arbitrator power to make the award he made. An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage."

The Fifth Circuit, quoting from a companion case to Warrior & Gulf Navigation Co.,[5] further reiterated the federal preference for arbitration.

"It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of a contract, the Courts have no business overruling him because their interpretation of the contract is different from his." Teamsters Local Unions, 745, etc. v. Braswell Motor Freight Lines, 392 F.2d 1, 7 (5 Cir.1968).

■ The broad, inclusive language of the arbitration clause here agreed upon is sufficient to cover all disputes as to interpretation of the basic agreement. Other courts have held similar arbitration clauses applicable to disputes over wage provisions.[6] Because we hold that the Multi-State Grievance Committee had authority under the terms of the contract to decide the wage provision dispute, and since there is no showing that it exceeded that authority or was unfaithful to the terms of the collective bargaining agreement, its decision is binding on us and we may not substitute our own interpretation of the wage terms for that of the Committee.[7]

■ Lastly, we consider Local 667's counterclaim to enforce the arbitration award. The effect of submitting a dispute to the Multi-State Grievance Committee is governed by the Southern Supplement, which provides as follows:

"Where a State or Multiple State Committee, by a majority vote, settles a dispute no appeal may be taken to the Southern Conference Area Grievance Committee. Such decision will be final and binding on both parties."

In the case at bar the parties agree that the Multi-State Committee upheld Local 667's interpretations of the collective bargaining agreement and by majority vote awarded the greater wage package allegedly required by the contract. The question now before us on the counterclaim is whether the award is in proper form and judicially enforceable. Although the absence of a factual finding by the Committee in support of its conclusion would give us pause were we reviewing an administrative decision, the rule in force in the Fifth Circuit concerning labor arbitration awards is that ambiguity in the decision or its basis does not affect the validity of the award so long as it does not convincingly appear that the arbitrator was totally unfaithful to the terms of the collective bargaining agreement or exceeded the jurisdiction given him thereunder.[8] As the Court of Appeals stated in International Union of District 50, United Mine Workers of America v. Bowman Transportation, Inc., 421 F.2d 934 at 936 (5 Cir.1970), quoting with approval from a Third Circuit case which canvassed the

---

5. United Steelworkers of America v. American Mfg. Co., Fn. 4, supra.

6. Ampthill Rayon Workers, Inc. v. E. I. DuPont De Nemours & Co., 438 F.2d 1359 (4 Cir. 1971); F & M Schaefer Brewing Co. v. Local 49, etc., 420 F.2d 854 (2 Cir. 1970); Socony Vacuum Tanker Men's Ass'n v. Socony Mobil Oil Co., 254 F.Supp. 897 (S.D.N.Y.1966).

7. Smith v. Evening News Ass'n, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962);

International Union of District 50, United Mine Workers of America v. Bowman Transportation, Inc., 421 F.2d 934 (5 Cir. 1970); Kroger Co. v. International Brotherhood of Teamsters, etc., Local No. 661, 380 F.2d 728 (6 Cir. 1967); Truck Drivers & Helpers Local Union No. 728 v. Georgia Highway Express, Inc., 328 F.2d 93 (5 Cir. 1964).

8. See cases cited in Fn. 7, supra.

decisions on the standard of judicial review of labor arbitration awards:

"* * * a labor arbitrator's award does 'draw its essence from the collective bargaining agreement' if the interpretation can in any rational way be derived from the agreement, viewed in the light of its language, its context, and any other indicia of the parties' intention; only where there is a manifest disregard of the agreement, totally unsupported by the principles of contract construction and the law of the shop, may a reviewing court disturb the award." Ludwig Honold Mfg. Co. v. Fletcher, 405 F.2d 1123, 1128 (3 Cir.1969).

Although the conclusion announced by the Grievance Committee in the case at bar was terse and cryptic, "based on the facts presented, the union claim is upheld. Cost to the Company," we may not say that it disregards the collective bargaining agreement. The hearing before the committee was admittedly brief, but from the transcript it appears that the principal factual issues presented to this court were also before the arbitration committee. It would be idle speculation for us to divine the reasons for the committee's decision solely from a colloquy between Mr. Dean and a member of the committee concerning Article 31 of the former NMFA and Small Carriers' authority to represent Dean. However informal the procedures of the committee may have been, it is clear that by their contract both Dean and Local 667 intended to be bound to arbitrate all disputes arising under their collective bargaining agreement rather than submit them to the more formal and costly procedures of a court. It is equally clear that there was substantial evidence before the Multi-State Grievance Committee which would have justified its award, regardless of the process of reasoning employed to reach the result.

In summary, we hold that the arbitration award has not been shown to be based on fraud, collusion or unfairness. Nor is the award itself too vague or ambiguous to be enforceable. The award calls for the $1.85 wage increase to be applicable rather than the $1.10. In light of these factors, and in the absence of any showing by Dean, which has a heavy burden of proof in attacking an arbitration award, that the ruling was manifestly unfaithful to the collective bargaining agreement, we hold that the decision of the Multi-State Grievance Committee must and will be enforced by this court.

An order will be entered accordingly.